IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EDUARDO ALVAREZ,

                    Petitioner,

          vs.

SUZANNE M. PEERY, Acting Warden,
High Desert State Prison,[1]

                    Respondent.

No. 2:14-cv-00029-JKS

MEMORANDUM DECISION

          Eduardo Alvarez, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254.  Alvarez is in the custody of the California

Department of Corrections and Rehabilitation and incarcerated at High Desert State Prison.

Respondent has answered, and Alvarez has not replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

          On June 14, 2010, Alvarez was charged with attempted murder (count 1), second-degree

robbery (count 2), and false imprisonment by violence (count 3).  The information alleged gun

enhancements with respect to counts 1 and 2, and alleged great bodily injury enhancements with

regard to counts 1 through 3.  On direct appeal of his conviction, the Court of Appeal recounted

the following facts and evidence underlying the charges against Alvarez:

**1. *The Prosecution Case***
          In June 2008, Oscar Rodriguez lived in Cordelia, where he met Curtis Drennan
and Alvarez, both of whom sometimes stayed at the home of Rodriguez's neighbors,
Felicia P. and her 15–year–old brother, Manuel P., also known as "Junior."  Rodriguez

---

[1]          Suzanne Peery is substituted for Fred Foulk as Acting Warden, High Desert State
Prison.  FED. R. CIV. P. 25(d).

was a sharp dresser and appeared to have money, while Drennan and Alvarez appeared [to] be "broke."  Rodriguez liked to smoke marijuana.  Drennan took various drugs.

In early June 2008, Drennan's girlfriend asked Rodriguez for help because Drennan had overdosed on ecstasy.  When Rodriguez arrived at the P.s' house, Drennan was in pain and Alvarez was asleep.  Rodriguez was unable to wake Alvarez.  Rodriguez attempted to get Drennan into his car to take him to the hospital.  Drennan was "running around aimlessly" outside the house, and at one point fell down.  Rodriguez later heard that Drennan escaped from the hospital.

Late at night on June 11, 2008, Drennan, using Alvarez's cell phone, called Rodriguez and asked if he wanted to smoke marijuana.  Rodriguez said he did.  Rodriguez waited for 20 to 30 minutes for Drennan and Alvarez to arrive, and tried unsuccessfully to contact Drennan.  Rodriguez then drove down the street and parked in front of the P.s' house.  Rodriguez and Junior planned to obtain marijuana elsewhere.  Junior told Rodriguez that Drennan and Alvarez had called earlier and said they were planning to rob "Kesha" for drugs.

Drennan called Rodriguez from Alvarez's cell phone and stated that he had been waiting at Rodriguez's house.  Rodriguez knew that was not true because he had just left his house.  Rodriguez drove back to his house with Junior.  Drennan did not want Junior along, so Rodriguez drove him home.  Rodriguez got into the driver's side back seat of Alvarez's car and sat next to Alvarez.  Drennan sat in the front passenger seat.  Drennan introduced Rodriguez to the driver, "John–John," whom Rodriguez did not know.  Drennan, Alvarez and John–John appeared to be drunk, and their speech was slurred.

The four men drove to a Shell gas station.  Rodriguez was told to buy a couple of Swisher cigars, which they would use to roll and smoke marijuana.  Rodriguez was unable to get out of the car because the child safety lock was on.  Alvarez said a child had been in the back seat; Alvarez then told Drennan to get out and unlock Rodriguez's door.  As Rodriguez got out of the car, he unlocked the child safety lock.

After Rodriguez bought the cigars and returned to the car, John–John drove the car to a secluded vista point parking lot and backed into a parking spot near a recreational vehicle.  A semi-truck was also parked in the lot.  The area was not well lit.  The lot overlooked the freeway and a Jack–in–the–Box.  Rodriguez opened the door to dump the tobacco out of one of the cigars.  Everyone was silent, and it seemed to Rodriguez that they were surprised he could open his door.  Rodriguez gave his cigar to Drennan and waited to see the marijuana.  While he waited, Rodriguez played with his $380 gold "grill" (gold caps for his teeth), which he had shown to Drennan during the car ride.  Rodriguez, who wanted to go back home to sleep, said "'let's make this quick.'"  Drennan asked John–John if he wanted to "slap fight" outside the car.  Drennan and John–John walked about 10 feet away from the car and exchanged a "little smile," but did not fight.

Drennan and John–John returned and leaned against Rodriguez's door.  Alvarez pulled out a revolver and held it to Rodriguez's temple and neck.  Alvarez said, "'Give me everything you got.  Give me your wallet.'"  Rodriguez yelled at Drennan to "'check [his] boy[.]'"  Drennan leaned into the partially open window and said, "'You better do it the easy way or the hard way, man.  It's like, Eddie, man, you better use that, man.  You

2

better not be pulling it out and not using it.  You better use it.'"  Pointing the gun between Rodriguez's temple and neck, Alvarez responded, "'Don't think that I won't.'"  Rodriguez gave Alvarez his wallet, which had no money in it.  Alvarez was "extremely upset" and asked Rodriguez where all his money was.  Rodriguez said he did not have any, but then remembered he had $15 in his pocket for "munchies," and gave it to Alvarez.  Alvarez said, "'Where's the rest of it?'"  Rodriguez said he did not have any more money, but took his cell phone and car keys out his pocket.  Alvarez snatched them from Rodriguez.  Drennan said, "'Check him for more, check him for more.'"  Alvarez "sissy punch[ed]" Rodriguez in the face a few times, while still pointing the gun at Rodriguez.  Drennan said, "'Get his grill.'"  Drennan put his hand into Rodriguez's mouth.  Rodriguez was angry, slapped Drennan's hand away, pulled the grill out himself, and threw it on the ground.

John–John then opened Rodriguez's door.  Rodriguez put his left leg out of the car.  Rodriguez also attempted to slap or push away the gun Alvarez was holding.  Alvarez, Drennan and John–John yelled at Rodriguez to put his leg back in the car, saying "'You ain't going nowhere.  Where do you think you're going?'"  Drennan was holding a knife with a 10–12 inch blade, and threatened to stab Rodriguez if he did not do what Alvarez said.  Drennan also told John–John to pull out his "thing," which Rodriguez believed meant a gun, but he never saw John–John holding one.  John–John kicked Rodriguez in the head about five times.  Rodriguez noticed that Drennan was smirking.  Alvarez then shot Rodriguez in the back.  Rodriguez yelped.  He saw that Drennan "had a big old smile on his face[.]"  Rodriguez estimated that about two seconds elapsed between the time he put his leg out of the car and the time Alvarez shot him.

Alvarez tried to take off Rodriguez's belt and pants, but Rodriguez, who was hunched over after being shot, said he would do it himself.  Rodriguez fumbled with the belt but could not unfasten it.  Alvarez, Drennan and John–John yelled at Rodriguez to "'get out of the F'ing car.'"  As Rodriguez got out of the car, Alvarez shoved him.  Rodriguez dropped to his knees outside the car, fearing that, if he stood up, his attackers "would think that one shot wasn't enough[.]"  John–John jumped into the driver's seat.  Drennan looked at Rodriguez for a split second, slammed Rodriguez's door, and said "'This isn't the way this is supposed to happen.'"  Drennan got into the front passenger seat.  As the car drove away, Rodriguez could see Drennan looking at him through the rear window.

Rodriguez knocked on the door of the RV and then the semi-truck, but no one answered.  Rodriguez walked back to the Shell gas station, which took 15–20 minutes.  He passed out after arriving at the gas station.  Police and paramedics later arrived.  Rodriguez was in pain, and was lying on the floor with blood around him.  Rodriguez told police that "Eddie, Curtis, and John–John" had attacked and robbed him at the vista point, and that "Eddie" had shot him.  The paramedics took Rodriguez to the hospital, where he underwent emergency trauma surgery.

The parties stipulated that the medical evidence showed that the bullet entered the right side of Rodriguez's back, traveled through his lower left lung, and into his seventh rib, fracturing it.  There were bullet fragments throughout his chest area.  The bullet remains lodged in his rib cage, and he has a scar.

At the time of trial, Rodriguez still had sleepless nights and was nervous and antisocial.  He believed his physical problems were the reason he lost his job wrapping pallets.  He testified he had been "completely by myself" during the two years between the shooting and trial.

Detective Chad Sayre of the Solano County Sheriff's office responded to the scene of the shooting in the early morning hours of June 12, 2008.  Sayre found part of a cigar at the vista point.  He knocked on the doors of the RV and the semi-truck, but no one answered.  Sayre photographed Rodriguez after his surgery.  He had bruises and scuff marks on his face, as well as a cut lip.

Police found Alvarez's car in Pittsburg.  Evidence technician Kari Lee processed the car.  Lee found a grill on the floor, as well as blood on the rear driver's side seat.  (Rodriguez later identified a grill apparently found in the car as belonging to Alvarez.)  Lee also found a Swisher cigar, a pair of bloodstained jeans, Rodriguez's wallet (containing his driver's license), and a receipt in Rodriguez's name.  The glove compartment contained evidence of insurance in Alvarez's name.  In the trunk was a juvenile minute order in Alvarez's name.  At trial, Rodriguez identified the bloodstained jeans as belonging to Alvarez.

## 2. *The Defense Case*

Alvarez presented a duress defense to the robbery and false imprisonment charges, and an accident defense to the attempted murder charge and the allegation that he personally and intentionally discharged the gun.

Alvarez testified on his own behalf.  When Alvarez was about 17 years old, he met Drennan, who Alvarez believed was older.  They went to parties, drank, and smoked marijuana and crystal methamphetamine together.  Alvarez's stepfather kicked Alvarez out of the house when Alvarez turned 18 and received a "settlement check" for over $11,000.  Alvarez began staying with Drennan, who was his good friend.  During a two-month period, Alvarez spent $6,000 of his settlement money to buy crystal methamphetamine and smoke it with Drennan.

On the afternoon before the shooting, Alvarez and Drennan were drinking and smoking marijuana and crystal methamphetamine.  Drennan, who had escaped from a hospital, was mad at Rodriguez and told Alvarez that he planned to rob Rodriguez.  Alvarez did not think Drennan was serious, but played along to impress Drennan.

Drennan told Alvarez that John–John was going to drive that night.  When John–John stopped the car at the Shell gas station and Rodriguez went inside, Drennan handed Alvarez a small gun.  Alvarez had never used a gun before.  Either when Alvarez took the gun or when Drennan and John–John later got out of the car at the vista point, Alvarez realized Drennan was serious about robbing Rodriguez.  Alvarez believed that Drennan and John–John had another gun, although he never saw one.  Alvarez was scared that, if he did not go along with the robbery, Drennan and John–John would shoot him. Alvarez knew that Drennan was a "bad dude," who had talked about robberies and carrying guns.

At the vista point, Alvarez wanted to get out of the car, but the child safety lock on his door was locked.  When Drennan and John–John leaned against Rodriguez's door,

4

Alvarez pointed the gun at Rodriguez and told him to "'Give me everything.'"  Drennan yelled at Alvarez that he had "better use it [.]"  Rodriguez gave Alvarez some items.  At some point, however, Rodriguez grabbed the gun and got on top of Alvarez.  Drennan yelled at Rodriguez to get off Alvarez or he would stab him.  Rodriguez got off Alvarez, and Alvarez punched him.  Drennan and John–John opened Rodriguez's door and started beating him.  When Rodriguez tried to get out of the car, Alvarez tried to pull him back because he did not want Drennan or John–John to shoot Rodriguez.  As Alvarez grabbed Rodriguez, the gun "accidentally went off."  Alvarez never meant to shoot Rodriguez.  Alvarez denied pushing Rodriguez out of the car; Alvarez believed that Drennan and John–John pulled Rodriguez out of the car.  Alvarez did not help Rodriguez because he was afraid of Drennan and John–John.

After the shooting, Drennan and John–John asked for the gun, so Alvarez gave it back to them.  After dropping off John–John, Drennan drove to a "dope house" in Pittsburg, where he and Alvarez smoked crystal methamphetamine.  After Drennan left, Alvarez stayed at the house for three days.  On June 15, 2008, Alvarez turned himself in to the police.[3]

> FN3.   As [discussed below], the defense case also included the expert testimony of Dr. Howard Friedman, a clinical neuropsychologist.

*People v. Alvarez*, No. A131036, 2012 WL 6011452, *1-4 (Cal. Ct. App. Dec. 3, 2012).

On October 28, 2010, a jury found Alvarez guilty of counts 2 and 3 (second-degree robbery and false imprisonment by violence) and also found true the enhancements tied to those counts.  The jury was deadlocked on count 1 (attempted murder), and the trial court declared a mistrial as to that count.  The trial court subsequently sentenced Alvarez to an indeterminate imprisonment term of 25 years to life, which was to run consecutive to a determinate term of 3 years and 8 months.

Through counsel, Alvarez appealed his conviction, arguing that: 1) the trial court violated Alvarez's rights to confrontation and to present a complete defense when it erroneously permitted Drennan, his former co-defendant, to assert a Fifth Amendment privilege and refuse to testify; 2) his trial counsel was ineffective for introducing expert testimony that opened the door to negative character evidence and failing to present exculpatory evidence; and 3) the trial court

failed to properly instruct the jury on the gun use enhancement.  The California Court of Appeal affirmed Alvarez's judgment in its entirety in an unpublished, reasoned opinion issued on December 3, 2012.  *Alvarez*, 2012 WL 6011452, at *16.  Counsel for Alvarez petitioned the California Supreme Court for review on the same grounds, which was summarily denied on March 13, 2013.

Counsel for Alvarez also filed in the Court of Appeal, concurrently with Alvarez's direct appeal, a petition for a writ of habeas corpus.  The habeas petition alleged that the prosecutor committed misconduct by using Alvarez's post-arrest silence to gain a conviction and that counsel was ineffective for failing to object to the misconduct, acquiescing in the trial court's response to a jury question relating to the alleged misconduct, and failing to request an instruction on a lesser included gun use enhancement.  The Court of Appeal denied the petition without comment on the same day it affirmed Alvarez's judgment on direct appeal.  Counsel for Alvarez also petitioned the Supreme Court for review of the habeas denial, which was likewise summarily denied on March 13, 2013.

Alvarez timely filed the instant Petition for a Writ of Habeas Corpus to this Court on December 17, 2013.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Alvarez raises two grounds for relief.  First, he argues that his rights to due process and to remain silent were violated by the prosecutor's questions and argument that he contends improperly commented on Alvarez's post-arrest silence.  Alvarez additionally contends that his trial counsel was ineffective for: a) failing to object to the prosecutor's improper questioning and argument; b) acquiescing to the trial court's

response to the jury's question about any statement made by Alvarez when he turned himself in and not requesting that the court instruct the jury about Alvarez's right to remain silent; c) introducing expert testimony that opened the door to character evidence about Alvarez; and d) failing to request an instruction on a lesser-included enhancement.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Here, the only decisions regarding the majority of Alvarez's claims were resolved by summary denials by the California Court of Appeal and California Supreme Court on habeas review. Thus, the California Supreme Court's summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Alvarez has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v.*

*Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true.

*See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.      *Prosecutorial Misconduct/Ineffective Assistance of Counsel–Failure to Object and
        Acquiescence to Response to Jury Question* (Grounds 1, 2a, and 2b)

Alvarez first argues that the prosecutor committed misconduct by violating Alvarez's

rights to remain silent and to due process.

The record reflects that, on June 15, 2008, Alvarez turned himself into the police and

exercised his right to remain silent after receiving *Miranda*[2] warnings.  At trial, Alvarez testified

on direct examination that he "didn't want [Drennan and John-John] to shoot [Rodriguez], so

[he] went and tried to grab [Rodriguez], and the gun accidentally went off."  When asked how he

felt about shooting Rodriguez, Alvarez testified:

> I feel bad.  I'm sorry that I even got into this situation.  I pray for him and his
> family.  I pray to God for forgiveness.  I know what I did was an accident, and I know
> God knows it was an accident, so I pray to God to forgive me, but I'm sorry to Oscar and
> his family.  I think about them all the time.  When I'm in my cell, I cry, and I just beg
> God for forgiveness, and I'm thankful that he's still alive, but what happened happened.
> There's nothing—I can't change the past.

On cross-examination, the following exchange occurred:

Q.      So you've had two-and-a-half years to think about this incident in your cell, as
        you put it, correct?

A.      Yes, ma'am.

Q.      And in two-and-a-half years, you haven't once told anyone in law enforcement
        this story, have you?

---

[2]      *Miranda v. Arizona*, 384 U.S. 436 (1966).

A.      No, sir–no ma'am.

Q.      . . . In fact, when Detective Sayre arrested you, you didn't say, "Hey I didn't intentionally shoot that guy.  It was an accident," did you?

A.      No.

MR. RUSSO:      Your Honor, I'm going to have to object.  I think this is an improper line of questioning, because it's–it–

THE COURT:      Overruled.

BY MS. RAY:

Q.      And you didn't call up Detective Sayre – you didn't call him up and say, "I was under duress.  I only committed that robbery because I was so afraid of Curtis Drennan," did you?

A.      No.  I didn't know nothing about the law or nothing.

Q.      Okay.  Well, you've since learned about the law, haven't you, because you and your lawyer have been talking about this testimony, haven't you?

A.      I tried.  I've had to read—read in my cell and I get case logs and everything.  I try to—

Q.      And you didn't pick up the phone over at the jail and say, "I need to see Detective Sayre because this was a big accident, this was a big misunderstanding," did you?

A.      No, I didn't.

Q.      Okay.  And you knew Curtis Drennan was in jail actually before you turned yourself in, correct?

A.      I think my godfather told me.

During her rebuttal summation, the prosecutor argued:

One of the instructions the Judge is going to read you is who has a reason to lie in this case?  Who has a motive?  Who has a bias?  The defendant.  He had two-and-a-half years, as he put it, sitting in his cell thinking about this case, and worrying about poor Mr. Rodriguez, and what he had done that night.

Well, that's talk about how he's been so worried about Mr. Rodriguez, what he did that night.  He had three days alone, three days alone, away from Curtis Drennan, this terrible Curtis Drennan.  Did he ever once pick up a phone and say, Hey, I got to tell you

10

what happened up on Vista Point, because I'm so remorseful about what happened?  Not once.

Did he ever contact the police and say, Hey there's a guy laying up at Vista Point?  Because as far as he knew—Oscar Rodriguez could have been dead, for all he knew, laying there.  There's a guy at Vista Point, somebody better go help that guy.  Not once.

The Judge is going to read you an instruction that talks about that.  When somebody flees the scene of a crime willingly and all this about, boy, I was so scared in the backseat, I could hardly just, you know, handle myself.  I'm the one with the gun, but I'm scared.  And he even said it, he slipped it, didn't he?  He said, "I was the one with the power.  I mean, at least I thought so."  "I'm the one with the power.  I've got the gun, but I'm afraid of all these other people."  Does that pass the common sense test?

Well, I kind of thought that maybe Curtis or John-John might have a gun, even though I didn't see one, because I got to bolster my theory about why I was so scared.  And, no, I don't try to slip out of the backseat when the back door is open and Oscar Rodriguez is getting out.  I'm helping him go, by the way.

It just doesn't pass any common sense.  He made up this story in these last two-and-a-half years to tell you, so that he could try to get away from what he did.

A suspect has a constitutional right not to speak to police after he is arrested and given his Miranda warnings.  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  As a consequence of that right, prosecutors are prohibited from commenting on a defendant's post-*Miranda* silence.  *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976); *United States v. Lopez*, 500 F.3d 840, 844 (9th Cir. 2007) (prosecutor's comment on defendant's post-*Miranda* silence violates Doyle).  The rationale for this rule "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial."  *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (citation and internal quotation marks omitted) (holding that prosecution may not use defendant's silence during case-in-chief).  Generally speaking, however, prosecutors are allowed to comment on a defendant's pre-arrest silence.  *Jenkins v. Anderson*, 447 U.S. 231, 240-41 (1980); *United States v. Oplinger*, 150 F.3d 1061, 1067 (9th Cir. 1998) ("[N]either due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the

silence of a person, not in custody or under indictment, in the face of accusations of criminal

behavior.") (internal quotation marks and citation omitted), overruled on other grounds, *United

States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc).

The record here indicates that the prosecutor's questions referred both to the time period

before Alvarez was arrested as well as after his arrest and up to the trial.  Importantly, however,

a fair reading of the prosecutor's closing argument rebuttal indicates that argument was limited

to the three days after the incident before Alvarez turned himself in to police.  Because those

comments were directed at Alvarez's pre-arrest and pre-*Miranda* conduct, they were not

improper or unconstitutional, and the Court of Appeal's rejection of Alvarez's claim as to those

comments was not unreasonable nor contrary to federal law.

More troubling, however, are the prosecutor's cross-examination questions which

referred to Alvarez's failure to inform law enforcement about his version of events when he was

arrested or at any time in the two-and-half-years he spent in jail prior to trial.  Respondent argues

that no *Doyle* violation occurred because: 1) Alvarez was not *Mirandized* immediately upon

turning himself in; and 2) his silence while in jail was used only to impeach his trial testimony

that he was remorseful and not his guilt.  Respondent does not dispute, however, that when he

turned himself in, he was read and invoked his *Miranda* rights.  The prosecutor's question about

"when Detective Sayre arrested you" also reasonably refers to the period after Alvarez invoked

his *Miranda* rights, and *Doyle* suggests that a defendant who testifies at trial cannot be cross-

examined on the fact that he had failed to provide the authorities with the story he presents at

trial at any time prior to trial.  *See Doyle*, 426 U.S. at 617-19.  And because Alvarez admitted

that he shot Rodriguez, it seems difficult to say that the questions impeached only Alvarez's

testimony that he was remorseful, given that his guilt centered on whether the shooting was accidental.

But in any event, this Court does not need to determine whether the questions violated *Doyle* because a *Doyle* error does not entitle a petitioner to habeas relief unless it "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 766 (1946)); *cf. Greer v. Miller*, 483 U.S. 756, 768-69 (Stevens, J., concurring) (explaining the different standard applied to a *Doyle* error on direct review to that applied on habeas review). In this case, the state courts summarily denied Alvarez's *Doyle* error claim and thus did not indicate whether they found the prosecutor's statements constituted *Doyle* error or whether any resulting error was harmless. This Court therefore must determine *sua sponte* whether any alleged error was harmless. When determining whether a *Doyle* violation constitutes harmless error, this Court considers three factors: "[1] the extent of comments made by the witness, [2] whether an inference of guilt from silence was stressed to the jury, and [3] the extent of other evidence suggesting defendant's guilt." *United States v. Velarde-Gomez*, 269 F.3d 1023, 1034 (9th Cir. 2001) (en banc) (quoting *United States v. Newman*, 943 F.2d 1155, 1158 (9th Cir. 1991)).

Here, the potentially improper line of questions by the prosecutor were for the most part fleeting, and, as previously discussed, there is no indication in the record that the prosecution stressed in closing argument Alvarez's post-*Miranda* silence. More importantly, the evidence against Alvarez was overwhelming.[3] Rodriguez testified that Alvarez pointed a gun at him,

_____

[3]      Other courts have admonished that harmless error review should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See, e.g.*, *Jensen v. Clements*, __ F.3d ___, 2015 WL 5210824, at *9 (7th Cir. Sept.

robbed him, punched him, kept him from escaping from the car, shot him in the back, and left

him for dead.  He further testified that Alvarez pointed the gun at him, threatened that he would

use it, and stated, "Don't think that I won't.  Don't think that I won't."  Alvarez admitted that he

robbed and shot Rodriguez, and the evidence showed that Rodriguez was seriously injured as a

result.  Alvarez also admitted at trial that he had his finger on the trigger while he was pointing

the gun at Rodriguez, he knew he had "all the power" because he was the person with the gun,

and he pulled Rodriguez back into the car when he attempted to escape.  In support of his

defense that the shooting was accidental, Alvarez presented only his own testimony and the that

of a clinical neuropsychologist who, on the basis of an interview and a series of tests, opined that

Alvarez did not have "a tendency to have aggressive or antisocial attitudes."  Indeed, Alvarez's

defense that the shooting was accidental was offered to rebut the attempted murder charge in

count 1, on which the jury was deadlocked, and his claim that he committed the robbery under

duress was significantly undermined by his own testimony as well as that of the victim.  Thus,

the evidence does not support any of the relevant factors necessary to a finding of prejudice.

Accordingly, based upon the record before it, this Court is without "grave doubt about whether

[the prosecutor's wrongfully-admitted statements] had 'substantial and injurious effect or

influence in determining the jury's verdict.'"  *Ayala*, 135 S. Ct. at 2198 (quoting *O'Neal v.*

---

8, 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry
is not the same as a review for whether there was sufficient evidence at trial to support a
verdict.").  The Court's reliance on the overwhelming evidence against Alvarez in finding that
any error was harmless does not simply focus on the sufficiency of the other evidence, but rather
properly "look[s] at the influence the improperly admitted [evidence] had on the verdict," in
light of a "host of factors," including the overall strength of the prosecution's case.  *Id.* at *11.

*McAninch*, 513 U.S. 432, 436 (1995)).  Alvarez is therefore not entitled to habeas relief on this

claim either.

For the same reasons, Alvarez cannot show that his counsel rendered ineffective

assistance by not specifically objecting on *Doyle* grounds to the prosecutor's argument regarding

Alvarez's pre-arrest silence or that he was prejudiced by either counsel's failure to object to the

prosecutor's questions pertaining to his post-arrest silence or stipulation to the response to the

jury's question.  To demonstrate ineffective assistance of counsel under *Strickland v.*

*Washington*, a defendant must show both that his counsel's performance was deficient and that

the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient

performance is one in which "counsel made errors so serious that counsel was not functioning as

the 'counsel' guaranteed by the Sixth Amendment." *Id.*  The Supreme Court has explained that,

if there is a reasonable probability that the outcome might have been different as a result of a

legal error, the defendant has established prejudice and is entitled to relief.[4]  *Lafler v. Cooper*,

132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001);

---

[4]      Where a habeas petition governed by AEDPA alleges ineffective assistance of
counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a
separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911,
918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).
Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas
proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And, because the
> *Strickland* standard is a general standard, a state court has even more latitude to
> reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*
*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

*Williams*, 529 U.S. at 393-95.  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).  Because the prosecutor's comments during rebuttal closing argument properly commented on Alvarez's pre-arrest silence, counsel was not deficient for failing to object to them.  And because the overwhelming evidence against him clearly undermined Alvarez's claim that the shooting was accidental,[5] it is not reasonable to believe that the outcome of his trial would have been any different had counsel acted in the manner that Alvarez now urges.  Alvarez therefore cannot prevail on his related ineffective assistance of counsel claims.

---

[5]     For the same reasons discussed in note 3, the Ninth Circuit recently rejected the Washington Supreme Court's pronouncement that, as a matter of law, as long as there was sufficient evidence to support the jury's verdict, no prejudice could result from a defense attorney's failure to request a lesser-included-offense instruction.  *See Crace v. Herzog*, 798 F.3d 840, 849 (9th Cir. 2015).  In *Crace*, the Ninth Circuit reasoned that the pronouncement "in essence controverted *Strickland's* prejudice inquiry into a sufficiency-of-the-evidence question—an entirely different inquiry separately prescribed by *Jackson* . . . ."  *Id.*  This Court's conclusion finding no prejudice under *Strickland* based on the overwhelming evidence against Alvarez should not be construed as reducing the question to sufficiency of the evidence.  Rather, the Court comes to its conclusion after fully analyzing "the question expressly posed by *Strickland*: whether there is a reasonable probability that, if the defendant's lawyer had performed adequately, the outcome of the proceeding would have been different."  *Crace*, 798 F.3d at 849.

B.       *Remaining Ineffective Assistance of Counsel Claims–Introduction of Character Evidence*
         (Ground 2c) *and Counsel–Failure to Request Instruction* (Ground 2d)

Alvarez also brings two standalone claims alleging that his trial counsel rendered

ineffective assistance.

1.       <u>Introduction of character evidence</u>

Alvarez first contends that his trial counsel was ineffective for presenting expert

testimony about Alvarez's character trait for nonviolence which opened the door to negative

information in Alvarez's juvenile file.  The Court of Appeal laid out the following background to

this claim:

> Prior to trial, Alvarez moved in limine to introduce expert psychological
> testimony about Alvarez's character trait for nonviolence.  The prosecutor moved to
> exclude the testimony, arguing that the expert should not be permitted to testify as to
> whether Alvarez possessed the mental state required for conviction.  The trial court ruled
> the testimony was admissible as character evidence.
>       After the close of the prosecution's case, the prosecutor stated that defense
> counsel had incorrectly stated in his opening statement that Alvarez had not been
> involved in the legal system prior to the current incident.  The prosecutor had since
> reviewed Alvarez's juvenile court file, which reflected that Alvarez had 32 disciplinary
> referrals, for matters including disruptive behavior and fighting, including a gang-related
> fight. Alvarez was also suspended for shooting a classmate with a weapon made out of
> pencils and a large rubber band, and on another occasion for threatening other students
> by brandishing a paring knife over his head.  Alvarez apparently had no sustained
> juvenile petitions.  The prosecutor asked the court to authorize her to use the information
> when she cross-examined Alvarez and his expert witness, Dr. Howard Friedman, because
> it was relevant to whether Alvarez had a nonviolent character.
>       Defense counsel objected, arguing that the information in the juvenile court file
> was unreliable hearsay, and was unsupported by any sustained petitions, documentation
> or other evidence.  He also argued that any evidence of gang involvement was more
> prejudicial than probative.
>       The trial court ruled that the prosecutor could use the information in Alvarez's
> juvenile court file for impeachment purposes during the cross-examination of Dr.
> Friedman.  The court stated that, since Alvarez was presenting evidence of his nonviolent
> character through Dr. Friedman, cross-examination about his alleged violent conduct was
> "fair game."  The court noted that a defendant's introduction of character evidence can be
> "dangerous," because it can result in jurors hearing more about the defendant's
> background than they otherwise would.  As to Alvarez's hearsay objection, the court

noted that the information was not being admitted for its truth, but to challenge the character witness's opinion about Alvarez's nonviolent character. The court concluded that, because the prosecutor's questions would be based on information in the juvenile court file, they would be asked in good faith.

On direct examination, Dr. Friedman, a clinical neuropsychologist, opined that, based on his evaluation, Alvarez was not a sociopath, did not have an aggressive or violent personality, and did not have antisocial attitudes. Dr. Friedman testified that alcohol would cause a person with Alvarez's personality characteristics to have less control over his behavior; in a violent situation or if others pushed him toward violence, he would have difficulty managing and restricting his behavior. Dr. Friedman testified that his testing indicated that Alvarez had some problems with acting out, but not at a level that would suggest he would be violent. Alvarez told Dr. Friedman that he had been involved in fights at school. After evaluating Alvarez but before testifying, Dr. Friedman reviewed materials from Alvarez's juvenile file. Nothing in those materials changed Dr. Friedman's conclusions about Alvarez.

During the prosecutor's brief cross-examination, Dr. Friedman testified that he had read Alvarez's juvenile file earlier that day. He had not read the police reports until after he prepared his report. Dr. Friedman testified that, although Alvarez told Dr. Friedman that his legal problems did not begin until he was 18, Alvarez still was a good source of information because he told Dr. Friedman about most of the information in his juvenile file (without specifying his age when the events occurred). Alvarez told Dr. Friedman he had possessed a knife at school, but did not tell him about a separate incident in which he threatened other students with a knife. Dr. Friedman conceded that there were some indicators of violence in Alvarez's life, because he had been in numerous fights while growing up. Dr. Friedman also agreed that it is violent to rob another person, point a gun at his head and neck, shoot him in the back, and push him out of a car and leave him for dead.

On redirect, Dr. Friedman testified that people generally act in conformity with their character and personality, but that it is not possible to predict how an individual will act at a particular time. Part of a psychologist's job is to look for reasons when a person acts outside of his or her character and personality.

*Alvarez*, 2012 WL 6011452, at *9-10.

The Court of Appeal then rejected any contention that trial counsel performed deficiently

by calling Dr. Friedman:

Based on the present record, defense counsel reasonably could have concluded that, despite the risk of impeachment, Dr. Friedman's testimony would bolster Alvarez's accident and duress defenses.

Dr. Friedman's testimony that Alvarez was not a sociopath or a violent person supported the defense theory that Alvarez shot Rodriguez accidentally, rather than intentionally. Although the prosecutor sought to impeach this testimony by asking Dr.

Friedman about Alvarez's fights at school, his possession of a knife at school, and his threatening other students with a knife, that conduct was less serious than the crimes charged in the present case. Accordingly, a tactical decision to present evidence suggesting that an intentional shooting was inconsistent with Alvarez's character (despite the risk of impeachment with incidents of lesser misconduct) would be consistent with defense counsel's effort to persuade the jury that the shooting was accidental.[11]

> FN11. We note that defense counsel's effort to raise a reasonable doubt as to Alvarez's mental state appears to have been partially successful. Although the jurors agreed that Alvarez intended to fire the gun, they deadlocked on the attempted murder charge, suggesting that they could not agree as to whether Alvarez intended to kill Rodriguez.

Dr. Friedman also testified that alcohol could cause a person with Alvarez's personality characteristics to have less control over his behavior, and, if the situation involved violence or if others were pushing him toward violence, he would have difficulty managing and restricting his behavior. Defense counsel could have reasonably concluded that this testimony would bolster the defense theory that Alvarez was afraid of Drennan and John–John and acted under duress when he participated in the crimes against Rodriguez. Accordingly, on the basis of the facts disclosed by the record, defense counsel could have had a reasonable tactical basis for his decision to present Dr. Friedman's testimony.[12]

> FN12. As Alvarez notes, a decision by defense counsel to forego the presentation of character evidence does not necessarily constitute ineffective assistance. (*See, e.g.*, *People v. Pangelina* (1984) 153 Cal. App. 3d 1, 8.) But this does not establish that a defense attorney who makes the opposite tactical decision has provided ineffective assistance.

*Id.* at *12.

The Court of Appeal's determination is both reasonable and fully consistent with federal law. As that court noted, defense counsel's performance was not deficient in this regard, but rather amounted to a reasonable tactical decision. Given that Dr. Friedman's testimony was helpful to the defense for the reasons thoroughly explained by the Court of Appeal, trial counsel made a reasonable tactical decision to call him to testify. Despite the impeachment he received from the prosecution, trial counsel's decision to call Dr. Friedman to the stand cannot be deemed outside the "wide latitude" afforded tactical decisions. *See Strickland*, 466 U.S. at 689.

Moreover, although the Court of Appeal, having decided this *Strickland* issue on the

deficiency prong, declined to address whether Alvarez was prejudiced by counsel's decision to

call Dr. Friedman, the record indicates that Alvarez can demonstrate no such prejudice.  As

previously discussed, the evidence against Alvarez was overwhelming, and there is no

reasonable likelihood that the result of his trial would have been different if Dr. Friedman had

not testified. *See id.* at 694.  Because the Court of Appeal's application of *Strickland* was not

objectively unreasonable, Alvarez is not entitled to relief on this claim.

       2.    <u>Failure to request instruction</u>

Finally, Alvarez alleges that counsel was ineffective for failing to request an instruction

on the lesser included gun use enhancement under California Penal Code § 12022.53(b).  The

Court of Appeal summarized the following facts underlying this claim:

> In connection with counts 1 and 2, the amended information alleged as
> enhancements that Alvarez: (1) personally used a firearm (§ 12022.53, subd. (b));
> (2) personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); and
> (3) personally and intentionally discharged a firearm causing great bodily injury
> (§ 12022.53, subd. (d)).  The prosecutor submitted a proposed instruction based on
> CALCRIM No. 3149, the instruction for the section 12022.53, subdivision (d)
> enhancement.  Neither party requested instructions on the enhancements in section
> 12022.53, subdivisions (b) and (c).
>
>     In connection with his defense that the shooting was accidental (and therefore he
> was not guilty of attempted murder or intentional discharge of a firearm), Alvarez
> submitted a proposed instruction based on CALCRIM No. 3404.  While discussing this
> proposed instruction, the trial court and the parties agreed that it should refer to the
> enhancement in section 12022.53, subdivision (d) (intentional discharge with great bodily
> injury), but not the enhancement in section 12022.53, subdivision (c) (intentional
> discharge), because there was no basis for a jury finding that Alvarez intentionally
> discharged the gun but did not cause great bodily injury to the victim.  The court and the
> parties had the following exchange:
>
> > "THE COURT: . . . So if it reads—you're in agreement then if it reads, 'The
> > defendant is not guilty of attempted murder or the allegation of personal
> > and intentional discharge of a firearm, a handgun, which proximately
> > caused great bodily injury to O.R. within the meaning of Penal Code

section 12022.53?' Would we have (d) or (c), because I don't—I think the
evidence here is either there's the discharge of a firearm with great bodily
injury or nothing, because I don't think there's any testimony that—that
the complaining witness didn't suffer anything but great bodily injury.

"[DEFENSE COUNSEL]: Right.  Right.  No, but it's just—I just did it according
to the Information.

"[PROSECUTOR]: Right.
"THE COURT: I know.  This is not a criticism.  This is—

"[PROSECUTOR]: No.  I agree.  I mean, I don't think they're going to find that
he shot the gun but didn't cause great bodily injury.

"THE COURT: Right. So we should just tell them 12022.53 subdivision (d),
correct?

"[PROSECUTOR]: Right.

"THE COURT: Do you agree, [defense counsel]?

"[DEFENSE COUNSEL]: Yes, I agree."

After the court read the proposed accident instruction with the reference only to
section 12022.53, subdivision (d), defense counsel confirmed that he agreed with the
instruction.

Later in the jury instruction conference, the court and the parties discussed the
instructions on the elements of the charged crimes and enhancements, and noted that
neither the instructions nor the verdict form should refer to the enhancement in section
12022.53, subdivision (c).  They decided not to use CALCRIM No. 3150, which is
appropriate when the enhancements in section 12022.53, subdivisions (c) and (d) are both
charged.  (See CALCRIM No. 3150, Bench Notes.)  The parties did not discuss the
enhancement in section 12022.53, subdivision (b) (personal use of a firearm), or
CALCRIM No. 3146, the instruction covering that enhancement.  At the conclusion of
the conference, the parties confirmed they had no objections or additions to the court's
instructions.

The court subsequently instructed the jury on the section 12022.53, subdivision
(d) enhancement, using a modified version of CALCRIM No. 3149.  The court also
instructed the jury on the defense of accident, using a modified version of CALCRIM
No. 3404 that referred only to the section 12022.53, subdivision (d) enhancement.  The
court did not instruct the jury on the enhancements in section 12022.53, subdivisions (b)
and (c).

The verdict form, which both parties approved, asked the jury to determine the
applicability of the section 12022.53, subdivision (d) enhancement.  The verdict form did

not refer to the enhancements in section 12022.53, subdivisions (b) and (c), and did not ask the jury to determine whether those enhancements applied.

*Alvarez*, 2012 WL 6011452, at *13-14.

Addressing the related question of whether the trial court had a sua sponte duty to instruct on a lesser included enhancement, the Court of Appeal concluded that such instruction was not required in Alvarez's case, relying on the California Supreme Court's decision in *People v. Majors*, 956 P.2d 1137, 1154 (Cal. 1998), which explicitly held that a trial court has no duty to sua sponte instruct on "so-called 'lesser included enhancements.'"

Alvarez argued on direct appeal, and appears to re-assert in the Petition, that the Court of Appeal's determination is unreasonable because *Majors* runs contrary to the United States Supreme Court's holdings in *Blakely v. Washington*, 542 U.S. 296 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Blakely* and *Apprendi* hold that any fact, other than a prior conviction, which increases a penalty for a crime above the statutory maximum must be proven beyond a reasonable doubt to a jury. *Blakely*, 542 U.S. at 301 (quoting *Apprendi*, 530 U.S. at 490). Alvarez asserted before the state courts that these cases have "eviscerated *Major*'s distinction between a sentence enhancement and a substantive offense because the essential principle underlying the *Apprendi* line of cases is that there can be no constitutionally meaningful difference between the two." *Alvarez*, 2012 WL 6011452, at *15.

But as the Court of Appeal found, those cases are inapplicable here. "As the holding in *Majors* does not remove from the jury the ability to act as the factfinder to increase the penalty for a crime beyond the maximum sentence that would be available for a conviction of the underlying offense alone. Here, for example, the jury, not the trial court, determined the section 12022.53, subdivision (d) enhancement applied." *Id.* Indeed, no Supreme Court case adopts the

*Apprendi* line of reasoning to require, as Alvarez urges, an instruction on lesser included sentence enhancements.

Moreover, the evidence adduced at trial indicated that Alvarez discharged the firearm causing great bodily injury: Rodriguez testified, and Alvarez admitted, that Alvarez shot him; the parties stipulated that the bullet lodged in Rodriguez's rib cage and that there were bullet fragments throughout his chest; and Rodriguez was in the hospital seven or eight days and continued to have pain because the bullet remained lodged in his rib cage.  No reasonable view of this evidence supports a finding that Alvarez used the firearm but either did not discharge it or did not cause Rodriguez great bodily injury.

Because the instruction was not required by case authority and was not supported by the evidence presented, trial counsel cannot be deemed ineffective for not requesting it.  Failure to raise a meritless argument is not ineffectiveness, and a petitioner cannot establish that he was prejudiced by such failure.  *See Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2008); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985).

Moreover, even if Alvarez could show that counsel was deficient for failing to request such an instruction, any argument that he was prejudiced by the failure fails for an additional reason.  As the Court of Appeal reasonably concluded in the alternative:

> The jury, after being properly instructed on the section 12022.53, subdivision (d) enhancement, found that Alvarez personally and intentionally discharged a firearm causing great bodily injury.  If the jury had also considered and found true the lesser allegation that Alvarez personally used a firearm under section 12022.53, subdivision (b), the statute would have required the trial court to impose "the enhancement that provides the longest term of imprisonment[,]" *i.e.*, the 25–years–to–life term specified in section 12022.53, subdivision (d).  (See § 12022.53, subd. (f).)  Alvarez's sentence would have been identical to the one he actually received.

*Alvarez*, 2012 WL 6011452, at *16.

23

Accordingly, Alvarez cannot prevail on his standalone ineffective assistance of counsel claims in any event.

## V. CONCLUSION AND ORDER

Alvarez is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability solely with respect to his *Doyle* error claim and the related ineffective assistance of counsel claims (addressed in Part IV.A).  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed

further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of

Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P.

22(b); 9TH CIR. R. 22-1.

     The Clerk of the Court is to enter judgment accordingly.

     Dated: October 9, 2015.

                         /s/James K. Singleton, Jr.
                         JAMES K. SINGLETON, JR.
                         Senior United States District Judge